**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Christopher D. Casey,                   )
                                        )   No. CV-09-138-TUC-DTF
     Plaintiff,                       )
                                        )   **ORDER**
vs.                                     )
                                        )
Michael J. Astrue, Commissioner of      )
the Social Security Administration,     )
                                        )
     Defendant.                       )
_____)

      Plaintiff brought this action pursuant to 42 U.S.C. § 1383(c)(3), seeking judicial review of a final decision by the Commissioner of Social Security (Commissioner). The parties consented to exercise of jurisdiction by a Magistrate Judge, pursuant to 28 U.S.C. § 636(c)(1). (Doc. Nos. 10, 14.) This case presents two issues on appeal: whether the Administrative Law Judge (ALJ) properly evaluated the evidence from Plaintiff's treating mental health source, Nurse Practitioner Judy Hileman, and whether the ALJ erred by failing to provide clear and convincing reasons for discounting Plaintiff's credibility. Based on the pleadings and the record, the Court finds Plaintiff is not entitled to relief.

## PROCEDURAL HISTORY

      Plaintiff filed an application for Social Security supplemental security income (SSI) on June 29, 2007. (Administrative Record (AR) 86-96.) Plaintiff alleges disability from June 1, 2007, to the present. (AR 86.) After Plaintiff's application was denied, he appealed the denials and appeared and testified before ALJ Peter J. Baum on August 6, 2008. (AR 23-47.) Subsequent to the hearing, the ALJ found Plaintiff was not disabled at step five because he could perform work available in significant numbers in the national economy. (AR 9-19.)

The Appeals Council denied Plaintiff's request to review the ALJ's decision. (AR 1-3, 149-54.)

## **FACTUAL HISTORY**

Plaintiff was born on August 18, 1963, making him 43 years of age at the time he filed his SSI application. (AR 86.) Plaintiff left school in the eighth grade (AR 27, 119) and has little employment history. From 1984 to 2002, Plaintiff had earnings in only seven years, ranging from $35 to $1800 per year; Plaintiff had no reported earnings after 2002. (AR 107-08.) Plaintiff stated that he stopped working in 2002 because of stress and an inability to cope. (AR 115.) Further, he reported that his medical condition limited his ability to work because he "cannot keep focused, my mind changes all the time, I become frustrated, the harder I try the worse it gets, unable to concentrate, mind wanders, I hear voices when I become stressed." (*Id.*)

Plaintiff was incarcerated for a few years; there are conflicting reports on the timing, but at the hearing he testified it was from 1999 to 2001. (AR 29, 199, 275.) In his application, Plaintiff stated that he had been homeless in Sierra Vista, Arizona, since January 1, 2005, without monetary assistance but he was receiving food stamps. (AR 92-93.) At the time of the hearing, Plaintiff was living in a subsidized apartment in Huachuca City, Arizona. (AR 25, 30.)

In December 2007, Plaintiff completed a function report in which he stated that he lived alone in an apartment. (AR 131.) Plaintiff reported that he could take care of his daily needs by himself without reminders or help, that he prepared his own simple food, cleaned and did his own laundry as needed, and shopped for groceries every week or two. (AR 132-34.) Plaintiff would get out a few times a week and was able to drive and go out alone. (AR 134.) Plaintiff indicated that he would sleep when depressed, up to twenty hours a day. (AR 132.) Plaintiff marked the following items as affected by his illnesses: standing, walking, seeing, memory, concentration and following instructions. (AR 136.) Plaintiff stated he could have difficulty getting along with others (because he thinks they judge him) but that

he did spend time with people talking, watching television and/or hanging out. (AR 135-36.) Plaintiff also stated that he is "blind in one eye," and was sure he needed surgery, glasses or contacts, and that he had acute cellulitis in both legs. (AR 138.) Additionally, he was hopeful that medication would help his concentration, memory, and mood. (*Id.*)

### **Physical Impairments**

At the time he applied for SSI, Plaintiff reported receiving treatment for swelling of his feet and legs. (AR 118.) On January 6, 2007, Plaintiff was treated at the emergency room for painful cellulitis in his right leg and foot. (AR 164-69.)

On March 14, 2008, Dr. Jerome Rothbaum completed an examination of Plaintiff pursuant to a Social Security Administration (SSA) referral. (AR 274-77.) Dr. Rothbaum confirmed that Plaintiff lost vision in his right eye from a childhood injury. (AR 275.) Dr. Rothbaum diagnosed Plaintiff with right eye blindness, venous insufficiency in his lower extremities and a fungal infection on the soles of both feet. (AR 276-77.) He concluded that these conditions would not impose limitations for a continuous twelve-month period. (AR 277.) On March 26, 2008, Dr. Jerry Dodson, an SSA reviewing physician, found no evidence of a severe somatic medical impairment (based on Dr. Rothbaum's exam). (AR 236, 281.)

### **Mental Health Treatment**

Southeastern Arizona Behavioral Health Services, Inc. (SEABHS) did an intake interview with Plaintiff on May 21, 2007. At that time, Plaintiff indicated he had occasional shortness of breath, swelling in ankles and legs (cellulitis flare ups), joint pain, back pain, and headaches. (AR 219-20.) He reported chronic pain at a level of 7 out of 10 from cellulitis and shin splints. (AR 220.) Plaintiff reported having problems with depression, anxiety, stress and hearing voices since 1998 when he was incarcerated. (AR 222.) Plaintiff stated that he had never received behavioral health services, out-patient or residential, and that this was his first time to address his depression and anxiety. (AR 220, 222.) He described these issues as ruining his life, he had lost his family and all possessions in the prior few years, and he was living in his car. (AR 221, 222, 225.) Plaintiff was diagnosed

with major depression recurrent and assigned a Global Assessment of Functioning (GAF) score of 56. (AR 229, 230.) That intake form required that if a person had a "qualifying diagnosis" and a GAF under 50, the assessor had to complete the Serious Mental Illness (SMI) Determination Addendum; the SMI determination was found not applicable to Plaintiff. (AR 217, 230.)

On June 3, 2007, Nurse Practitioner Judy Hileman completed a psychiatric evaluation of Plaintiff. (AR 198.) She reported that his affect was blunted, his mood was anxious, depressed and guarded, and he had diminished alertness. (AR 200.) NP Hileman found his concentration was fair and his memory intact. (AR 201.) She diagnosed him with depression with psychotic features (auditory hallucinations), and noted that he needed to be evaluated for bipolar or schizoaffective disorder. (AR 202.) She assigned him a GAF score of 45.[1] (*Id.*) NP Hileman noted a need to start SMI verification (*id.*); SMI status provides a source of funding for treatment, case management and housing.

On June 13, 2007, Dr. William Sullivan of SEABHS agreed to sign the SMI checklist as requested by NP Hileman but stated that he was skeptical. (AR 197.) In particular, Dr. Sullivan noted that Plaintiff's report of voices beginning ten years ago in prison was inconsistent with schizophrenia or schizoaffective disorder. (*Id.*) SEABHS submitted paperwork for Plaintiff as someone with SMI, and it was approved by the Community Partnership of Southern Arizona, Regional Behavioral Health Authority. (AR 203-06.)

At a July 13, 2007 appointment, Plaintiff's mood was depressed and he reported auditory hallucinations two to three times a day. (AR 196.) Plaintiff was staying at a friend's apartment and expressed a willingness to try medication; he was prescribed Risperdal. (*Id.*) In September and October, NP Hileman listed Plaintiff's Axis I diagnosis as bipolar I depressed with psychotic symptoms versus schizoaffective disorder. (AR 210, 212.) On September 29, 2007, Plaintiff reported that he had not been compliant with trying

---

[1] Initially she wrote in 55 as the GAF; that was crossed through and a 45 was written in and initialed by JH.

the Risperdal as he was concerned about his safety if it were to make him too sleepy – he was sleeping in his car or at a friend's house. (AR 212.) His mood was depressed and anxious and he reported auditory hallucinations. (*Id.*) At an October 19 follow-up, Plaintiff's report was the same; however, he had tried Risperdal and did not like the side effects. (AR 210.) Plaintiff was prescribed Abilify. (*Id.*) On July 27 and October 14, 2007, Plaintiff failed to show for scheduled medication monitoring appointments at SEABHS. (AR 195, 211.)

Plaintiff was seen on April 11, 2008, by NP Hileman, who listed schizoaffective disorder and ADD/ADHD as diagnoses. (AR 291.) She noted that his mood was depressed, anxious and irritable, and he was still experiencing auditory hallucinations. (*Id.*) Plaintiff had stopped taking medication because he said it was making him tired; NP Hileman put him on a retrial of Abilify and prescribed Concerta. (*Id.*) In NP Hileman's notes of May 16, 2008, she listed ADD/ADHD and depression as diagnoses, as well as "consider schizoaffective vs bipolar," although Plaintiff denied any hallucinations at that time. (AR 296.) Plaintiff had stopped taking Abilify and Concerta because they made him too sleepy; NP Hileman prescribed Adderall and bupropion. (*Id.*) On May 23, 2008, NP Hileman listed ADD/ADHD and Bipolar I with history of psychotic features as the diagnoses. (AR 295.) Plaintiff reported taking the prescribed medication and agreed to continue, but had been experiencing some daytime tiredness. (*Id.*)

On July 25, 2008, NP Hileman completed a Mental Residual Functional Capacity Questionnaire on which she diagnosed Plaintiff with ADHD, Anxiety, Bipolar I – depressed with history of psychotic features; on a subsequent page she stated that he had some signs of bipolar syndrome but that it had not yet been diagnosed. (AR 305, 306.) She reported his GAF score as a 50, with 55 as the highest in the past year. (*Id.*) NP Hileman stated that Plaintiff was currently on Adderall and bupropion, which had caused daytime tiredness and that his anxiety was poorly controlled in terms of dealing with people. She found that Plaintiff was seriously limited but not precluded in the following areas needed for unskilled work: maintain attention for two hour period; work in proximity to others without being distracted; complete a normal work day and work week without intrusion from psychological

symptoms; perform at a consistent pace; accept instructions and respond to superiors; get along with and not distract coworkers; respond to changes in work setting; and deal with work stress. (AR 307.) NP Hileman opined that Plaintiff would be unlikely to maintain attendance due to anxiety, hallucinations, and poor focus and concentration. (AR 308.) Finally, she noted that his ability to work might improve with medication but that, to date, he was too anxious to tolerate medication consistently. (AR 309.)

### **Mental Health Consulting and Reviewing Physicians**

On February 22, 2008, Plaintiff was referred by the SSA and examined by psychologist Machelle Martinez. (AR 251-52.) Plaintiff reported having been prescribed Risperdal and Abilify, but having stopped taking them due to side effects. (AR 251.) Plaintiff reported some depression at all times, including dwelling on negative thoughts. (*Id.*) Plaintiff stated that his sleep was variable, including sleeping up to eighteen hours and being unable to sleep at other times; however, when working he did not sleep all day. (AR 251, 252.) Plaintiff indicated that when he was really stressed out he would occasionally hear voices telling him that everyone was against him. (AR 251.) Plaintiff reported difficulty focusing and a tendency to daydream. (*Id.*) Plaintiff scored a 29 out of 30 on the mental status exam, his attention and concentration were good and memory was intact; behavior observations were unremarkable although a slightly depressed mood was noted. (AR 252.) Dr. Martinez diagnosed Plaintiff with depressive disorder NOS, and found that he did not meet the bipolar disorder criteria. (*Id.*) She further opined that Plaintiff could remember locations and work procedures and understand and remember simple instructions; had some limitations based on delayed memory performance; could complete simple, short tasks, maintain attendance, work without supervision and make simple work decisions; could ask simple questions, accept instruction and maintain appearance; and could travel to unfamiliar places and plan independently but had slight limitations adjusting to changes in work environment. (AR 254.)

On March 5, 2008, Dr. Campbell completed a Psychiatric Review Technique form, based on a review of Plaintiff's records, in which he diagnosed Plaintiff with depressive

disorder and stated that an RFC assessment was needed. (AR 256, 259.) Dr. Campbell found that Plaintiff had a mild limitation in maintaining social functioning, and a moderate limitation in maintaining concentration, persistence and pace. (AR 266.) In a Mental Residual Functional Capacity Assessment, Dr. Campbell reported that Plaintiff had no limitations or was not significantly limited in all categories but one, which was that he identified a moderate limitation in Plaintiff's ability to maintain attention and concentration for extended periods. (AR 270.) Dr. Campbell concluded that Plaintiff could work around others and adapt to changes, and could "meet the expectations of full time employment doing simple tasks." (AR 272.)

**Hearing and ALJ's Decision**

At the August 6, 2008 hearing, Plaintiff told the ALJ that it had always been difficult for him to keep a job and he had never worked for any length of time; he stated that he had lost his whole family and had a hard time concentrating. (AR 28.) Plaintiff testified that due to depression he would sleep ten to sixteen hours a day, and that he spent the rest of his time sitting around. (AR 31, 35.) He reported that all of the medication made him feel like a zombie and knocked him out. (AR 35.) Plaintiff testified that he worked as a tire deliverer, but the probation department made him quit, that he worked at Hertz rental car, which ended because he was sent to prison, and he was a cashier at Walmart in 2002, from which he was fired for being late once. (AR 39-40.)

Ruth Van Vleet testified as a vocational expert and opined that, using Dr. Martinez's limitations or Dr. Campbell's limitations, Plaintiff was not significantly limited in his ability to do a range of unskilled work. (AR 41-43.) Van Vleet testified that if Plaintiff had the limitations on unskilled work set forth by NP Hileman he could not sustain employment. (AR 44-45.)

The ALJ issued a decision on September 23, 2008, in which he determined that Plaintiff was not disabled. The ALJ found that Plaintiff had one severe mental impairment, affective disorder, and no severe physical impairments. (AR 11-12.) The ALJ found that Plaintiff had the RFC to perform a full range of work with the following nonexertional

limitations:

> moderately limited ability to maintain concentration and attention for extended periods; mild limitations in learning and remembering detailed instructions; some limitations in concentration, persistence or pace which interfere in completing detailed tasks on a consistent basis; mild limitations in following a schedule and completing simple tasks on a consistent basis due to depression; can work with and around others; claimant can adapt to changes; and can meet the expectations of full time employment doing simple tasks (Exhibit 10F).

(AR 14.) This RFC was based on the limitations assigned by reviewing physician Dr. Campbell. (AR 270-73.) The ALJ did not find Plaintiff and his alleged symptoms fully credible, and gave little weight to NP Hileman's assessment because it was inconsistent with the clinical evidence and other medical sources. (AR 14-16.) At step four, the ALJ found that Plaintiff had no past relevant work; therefore, he moved on to step five. (AR 16.) The ALJ concluded Plaintiff was capable of performing full-time unskilled work, which exists in significant numbers in the national economy. (AR 17.)

## STANDARD OF REVIEW

The Commissioner employs a five-step sequential process to evaluate SSI claims. 20 C.F.R. § 416.920; *see also Heckler v. Campbell,* 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's residual functional capacity (RFC) precludes him from performing his past work. 20 C.F.R. § 416.920(a)(4). At step five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. § 416.920(a)(4).

In this case, Plaintiff was denied at step five of the evaluation process. The step five determination is made on the basis of four factors: the claimant's RFC, age, education and work experience. *Hoopai*, 499 F.3d at 1074. "The Commissioner can meet this burden

through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines." *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). The findings of the Commissioner are meant to be conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). This is so because the ALJ "and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney*, 981 F.2d at 1019 (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion. *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

## ANALYSIS

### Nurse Practitioner's Opinion

Plaintiff contends the ALJ improperly discounted the opinion of NP Hileman by referring to her as a "nonmedical source." (AR 15.) The ALJ made the following statement regarding NP Hileman's opinion:

> An opinion from a nurse practitioner is considered a nonmedical source (20 C.F.R. 416.913(d)). However, the undersigned has considered this assessment, but finds it inconsistent with the overall clinical evidence and gives it limited weight. In addition, this opinion is not supported by other medical sources contained in the record.

(AR 15, 16.)  As conceded by the Commissioner, Plaintiff is correct in his assertion that the ALJ improperly referred to NP Hileman as a "non-medical source."  Nurse practitioners are classified as an "other" medical source.  20 C.F.R. § 416.913(d)(1).  This is in contrast to the category of "acceptable medical sources," which includes only physicians, psychologists, optometrists, podiatrists and speech pathologists.  20 C.F.R. § 416.913(a).  The distinction between "acceptable medical sources" and "other" medical sources is necessary for three reasons:

> First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment.  *See* 20 C.F.R. 404.1513(a) and 416.913(a).  Second, only "acceptable medical sources" can give us medical opinions.  *See* 404.1527(a)(2) and 416.927(a)(2).  Third, only "acceptable medical sources" can be considered treating sources as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.  *See* 404.1527(d) and 416.927(d).

Social Security Ruling (SSR) 06-03p.  The governing regulations and social security rulings make no distinction between categories of "other sources" whether medical, educational, social welfare, or lay witness.  Evidence from medical sources who are not "acceptable medical sources," such as nurse practitioners, is used for the same purpose as evidence from "non-medical sources," to show the severity of the individual's impairment(s) and how it affects the individual's ability to function.  *Id.*

The ALJ considered NP Hileman's opinion of the severity of Plaintiff's impairment and its functional effects.  This was the proper use for her opinion, which qualified as "other source" evidence.  The ALJ's improper reference to Nurse Hileman as a "non-medical source" constitutes harmless error.  *See Stout v. Comm'r, Social Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (an error is harmless if it was "irrelevant to the ALJ's ultimate disability conclusion.")

Plaintiff is correct in his assertion that, by regulation, the SSA generally gives more weight to opinions from examining sources than non-examining sources, and also gives more weight to treating doctors.  20 C.F.R. § 416.927(d)(1), (d)(2).  Contrary to Plaintiff's argument, NP Hileman is not entitled to treating or examining source status.  Although SSR 06-03p indicates that when evaluating other source evidence the ALJ should consider the

- 10 -

factors set forth in § 416.927(d), which includes the examining and/or treating relationship of a source, it did not incorporate those specific provisions as to other sources. The SSR lists only the other factors from the regulation as relevant to evaluating "other source" evidence, and reserves examining relationship and treating relationship status for acceptable medical sources. SSR 06-03p. However, one of the factors relevant to other sources is how long a source has known the claimant and the frequency of interaction. *Id.* The ALJ took this factor into account by acknowledging that Plaintiff received regular mental health treatment at SEABHS and citing to NP Hileman's treatment notes throughout his decision. (AR 11, 13, 14-15.)

Plaintiff further argues the ALJ failed to provide sufficient reasons for according NP Hileman's opinion such little weight. An "adjudicator generally should explain the weight accorded opinions from 'other sources' so that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p. However, it is not necessary for the ALJ to repeat the magical incantation, "I reject Nurse Hileman's opinion because . . ." *See Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989). A reviewing court may draw specific and legitimate inferences from discussions of the evidence, particularly where conflicting evidence is detailed and interpreted, and findings are made, in order to assess why a statement or opinion has been rejected or accepted. *Id.* Such a review is possible in this case.

The ALJ found that NP Hileman's opinion was both inconsistent with the clinical evidence and not supported by the medical sources, Drs. Martinez and Campbell. In the functional questionnaire, NP Hileman stated that Plaintiff was diagnosed with bipolar I with history of psychotic features (AR 305); however, in her treating notes and later in the same questionnaire she stated that bipolar syndrome had not been diagnosed although some symptoms were present (AR 306). The person conducting the intake at SEABHS found that Plaintiff did not come within the Serious Mental Illness designation (AR 217) and Dr. Sullivan at SEABHS was skeptical of Plaintiff's qualification for such status (AR 197). Dr.

Martinez found Plaintiff's mood to be only "slightly depressed" and she and Dr. Campbell concluded Plaintiff suffered from depressive disorder and not bipolar. (AR 259, 252.) Overall, NP Hileman's findings regarding Plaintiff's diagnosis and the severity of his impairment(s) stand alone without other record support.

Additionally, the record reveals several inconsistencies in NP Hileman's findings and instances in which her conclusions are not supported by the clinical evidence. Other than during her first examination, NP Hileman generally noted Plaintiff's affect to be congruent (AR 196, 210, 212, 291, 295) as did the SEABHS intake person (AR 228); however, in her functional questionnaire she stated that his affect was blunt, flat or inappropriate (AR 306). In the functional questionnaire, NP Hileman indicated that Plaintiff's memory was impaired and he had problems concentrating. (AR 306, 308.) During her initial evaluation, she found his concentration fair and his memory intact; there is no evidence in the record that subsequently she conducted any testing around this issue or that she witnessed impairment during her appointments with him. Further, at the SEABHS intake, Plaintiff's digit recall appears to have been tested without note (AR 228) and Dr. Martinez tested Plaintiff and found his concentration to be good and his memory to be intact (AR 252). NP Hileman also stated in the functional questionnaire that Plaintiff experienced both auditory and visual hallucinations (AR 306); however, neither her records nor those from any other source document visual hallucinations. Overall, the record indicates that Plaintiff was independent in his activities of daily living, cooperative in his appointments, fully oriented, and his thought process was coherent and logical. In sum, there is substantial evidence in the record to support the ALJ's finding that NP Hileman's opinion was inconsistent with the clinical evidence and not supported by the medical sources; therefore, he provided a sufficient basis to accord it limited weight.

Plaintiff contends the ALJ should not have relied on Dr. Martinez's opinion because she only saw him one time and her conclusions were unfounded in light of some of the information available to her. Examining medical sources are by definition ones that do not have an ongoing relationship with a claimant; while that is relevant when contrasted with a

treating source, in this case there is no treating acceptable medical source and it provides no basis for discounting her opinion. Further, Dr. Martinez conducted record review in addition to her examination.

Plaintiff argues that Dr. Martinez's finding that Plaintiff could maintain attendance was contradicted by her note that he sometimes slept for 18 hours and at other times could not sleep, as well as the fact that he had previously missed a consultative examination. In addition to the fact that Plaintiff arrived promptly for his appointment with Dr. Martinez, she also noted that he reported not sleeping all day when employed, that he was late only once when working for Walmart, he completed the necessary activities for daily living, and his mental status was good. (AR 252.)

Plaintiff disputes Dr. Martinez's finding that his social interaction was sufficient for employment based on his behavior during the exam and that he did not report any difficulty interacting with others. Plaintiff contends that her report does not evidence any discussion with him about his interactions with others and that when Plaintiff attempted to work on a cleaning crew in June 2008 he had difficulties with his coworkers. Dr. Martinez opined about Plaintiff's ability to interact with others based on the information available to her, including the SEABHS records up to that point and her interaction with Plaintiff during the examination. That information provides sufficient support for her finding and no other record evidence is in significant contradiction. None of NP Hileman's notes provided information about how Plaintiff interacted with others or indicated he would be unable to interact with co-workers. The information Plaintiff has provided about himself and his employment, including in his function report, indicated he would spend time with others (although he thought people judged him), that he got along with authority figures and had not lost a job due to interactions with other people. (AR 134-37.) The only contrary information is one June 2008 progress note from Plaintiff's three-day job through SEABHS indicating Plaintiff was not working well with some of his peers (AR 293); however, Plaintiff testified that he lost that job because he missed his ride (AR 29).

There was substantial evidence in the record to support the ALJ's reliance on Dr.

Martinez's conclusions, including Plaintiff's ability to maintain attendance and work with others. As noted by Plaintiff, Dr. Campbell relied heavily on Dr. Martinez's examination; thus, Plaintiff's challenge to Dr. Campbell's opinion on the basis that the reliance was misplaced is without merit. Plaintiff's only other challenge to Dr. Campbell's assessment is that he never examined Plaintiff and his review was limited to the period up to March 5, 2008, when he completed his report. Dr. Campbell conducted precisely the type of assessment requested by the SSA, which did not involve an examination and was necessarily limited in time. While those factors are relevant to an ALJ's evaluation of his opinion, *see* 20 C.F.R. § 416.927(d), they do not render the assessment flawed and the ALJ was required to consider Dr. Campbell's opinion and give it appropriate weight, SSR 96-6p.

Other factors relevant to the ALJ's assessment of medical opinions include: "[t]he degree to which the 'acceptable medical source' presents an explanation and relevant evidence to support an opinion" and "[h]ow consistent the medical opinion is with the record as a whole." SSR 06-03p. The ALJ detailed the supporting explanation of Dr. Martinez (AR 11, 13, 14-15) and noted that Dr. Campbell's opinion regarding Plaintiff's ability to focus and concentrate was most consistent with the record as a whole (AR 15). It may be inferred that these factors outweighed the psychologists' alleged limited perspective. Additionally, the fact that an opinion is from an "acceptable medical source" may justify giving that opinion greater weight than an opinion from another medical source who is not because acceptable medical sources are considered the most qualified health care professionals. *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996). Although such an inference is unnecessary to affirm the ALJ's decision, it provides additional support for the ALJ's decision to infer that such a hierarchy was relied upon in this case.

### **Plaintiff's Credibility**

Plaintiff stated he was unable to work because he was unable to focus, got frustrated, heard voices, and was easily stressed. (AR 14.) Plaintiff challenges the ALJ's finding that Plaintiff was not entirely credible regarding the debilitating nature of those symptoms: "the claimant's medically determinable impairment could reasonably be expected to produce the

alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." (*Id.*) The ALJ went on to find that based on the record Plaintiff's medications did not cause side effects that would interfere with his ability to perform unskilled work; Plaintiff's treatment records indicated mental health improvement not treatment failure; and Plaintiff's lack of employment record and incarceration suggest lack of motivation not inability to work. (AR 14-15.) Plaintiff argues that none of the reasons provided by the ALJ provide a clear and convincing basis for discounting his credibility.

In general, "questions of credibility and resolution of conflicts in the testimony are functions solely" for the ALJ. *Parra v. Astrue,* 481 F.3d 742, 750 (9th Cir. 2007) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). However, "[w]hile an ALJ may certainly find testimony not credible and disregard it . . . [the court] cannot affirm such a determination unless it is supported by specific findings and reasoning." *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 884-85 (9th Cir. 2006); *Bunnell v. Sullivan*, 947 F.2d 341, 345-346 (9th Cir. 1995) (requiring specificity to ensure a reviewing court the ALJ did not arbitrarily reject a claimant's subjective testimony); SSR 96-7p. "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell,* 947 F.2d at 344). The ALJ found Plaintiff had satisfied part one of the test by proving impairments that could produce the symptoms alleged. (AR 14.) Second, if "there is no affirmative evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281, 1283-84 (9th Cir. 1996)). The ALJ did not make a finding that Plaintiff was malingering; therefore, to support

his discounting of Plaintiff's assertions regarding the severity of his symptoms, the ALJ had to provide clear and convincing, specific reasons. *See Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quoting *Lingenfelter*, 504 F.3d at 1036).

"The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'n of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). When assessing a claimant's symptoms, the ALJ should consider, in addition to objective medical evidence, his daily activities; the location, intensity, frequency and duration of the symptom; factors that trigger or exacerbate the symptom; the effectiveness of any medication to alleviate the symptom and any side effects; treatment the claimant receives for relief of the symptom; any steps other than treatment used to relieve the symptom (such as lying down or changing position); and any other factors relevant to claimant's limitations due to the symptom. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. In assessing credibility the ALJ can also consider the claimant's "reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citing *Smolen*, 80 F.3d at 1284).

First, Plaintiff contends the record establishes that Plaintiff does have side effects from medication that impact his ability to work. Specifically, NP Hileman reported that Plaintiff experiences daytime somnolence due to the medication and Dr. Martinez recorded that Plaintiff was sleeping up to eighteen hours a day. At the hearing, Plaintiff reported that he had tried several medications that "knocked [him] out," but he stopped taking them (AR 36-38); this factor was explicitly relied upon by the ALJ. Plaintiff did not report that the medications he was currently prescribed were causing drowsiness. (*Id.*) Similarly, at the time Plaintiff was examined by Dr. Martinez, he was not taking any medication; therefore, his reports of sleeping for lengthy periods of time was not a medication side-effect. Although the record indicates Petitioner had sleep disturbances and often slept for long periods of time, Dr. Martinez reported that during his short periods of employment, Plaintiff

did not sleep all day. (AR 251.) Additionally, in the Mental Residual Functional Capacity Questionnaire, when asked about Plaintiff's potential work absence, NP Hileman did not include somnolence as a basis for Plaintiff missing work. (AR 308.) Finally, Plaintiff did not contend that he was unable to work due to tiredness and always maintained that despite his impairments he was independent in his activities of daily living. (AR 28, 115, 131-37.)

Second, Plaintiff disputes the ALJ's finding that Plaintiff's mental health had improved with treatment because NP Hileman stated that medication provided poor anxiety control and only if Plaintiff was better able to tolerate medication could he work in the future. Although NP Hileman opined in July 2008, for purposes of the SSA proceeding, that Petitioner had significant limitations, her ongoing treatment notes did, in fact, indicate that Plaintiff's mental health had improved over time. (AR 196, 198-202, 210, 212, 291, 295, 296.) During Plaintiff's May 2008 appointments, which are the last medical records included in the administrative record, Plaintiff reported no hallucinations and he told Dr. Martinez in February that he experienced auditory hallucinations only "once-in-awhile" if under significant stress. (AR 251, 295, 296.) Further, critical work factors, such as attention and concentration, coherent and logical thought process, and memory were reported to be good by Dr. Martinez, and NP Hileman was in agreement on several of those factors. (AR 252, 295, 296.)

Third, Plaintiff disputes the ALJ's finding that Plaintiff was not working due to lack of motivation. To contradict this finding Plaintiff points only to NP Hileman's conclusion that Plaintiff was not a malingerer; therefore, Plaintiff argues his lack of work record is a sign of his severe mental illness. The ALJ did not dispute NP Hileman's conclusion that Plaintiff was not malingering. Rather, the ALJ relied on Plaintiff's earnings record (AR 15), which was explored at the hearing (AR 28-30, 39-40). Although Plaintiff testified that he had never worked consistently and had a hard time concentrating (AR 28), the explanations he provided for stopping work at the times he was employed had nothing to do with mental health issues. Plaintiff testified that his probation officer made him quit his job as a tire deliverer, his job at Hertz rental car ended because he was sent to prison, and he was fired from his job as a

cashier at Walmart in 2002 due to being tardy because he was taking his mother to the doctor. (AR 39-40.) As pointed out by the ALJ, Plaintiff had no work between 2002 and 2007. Through SEABHS, Plaintiff worked with a cleaning crew for three days in 2008 and was let go for missing his ride to work. (AR 29.) He could not get back on the crew because it was full, but he did not ask them to help him find any other work and did not follow-up with Vocational Rehabilitation as he was told to do. (AR 29-30.)

There is clear and convincing evidence in the record, upon which the ALJ relied, to support the ALJ's three specific reasons for finding that Plaintiff was not entirely credible with respect to the extent of his limitations and that those limitations did not preclude Plaintiff from performing unskilled work.

## CONCLUSION

The Court concludes the ALJ's findings are supported by substantial evidence and there is no basis for reversing or remanding his decision. Therefore, Plaintiff is not entitled to relief and his appeal is denied.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. 19) is **DENIED**. **IT IS FURTHER ORDERED** that Plaintiff's case is **DISMISSED** and the Clerk of Court shall enter judgment.

DATED this 31st day of March, 2010.


D. Thomas Ferraro
United States Magistrate Judge